IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

MICHAEL PERRY                                                                    PLAINTIFF

        v.        Civil No. 4:07-cv-04013

LT MIKE GRAY, Hempstead
County Detention Facility; SGT SIMEON
AMES, Hempstead County Detention
Facility; SHAWN GARLAND, Hempstead
County Detention Facility; and
NURSE LORI JONES                                                                 DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Michael Perry (hereinafter Perry), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in the Arkansas Department of Correction. The events at issue in this lawsuit occurred when he was incarcerated at the Hempstead County Detention Facility. Plaintiff contends his civil rights were violated in the following ways: (1) excessive force was used against him; and (2) he was denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 25). To assist Plaintiff in responding to the summary judgment motion, a questionnaire was propounded (Doc. 35) by the Court. Plaintiff filed a timely response to the questionnaire (Doc. 36).

Plaintiff also filed a motion for summary judgment (Doc. 37). Defendants filed a response to Plaintiff's motion for summary judgment (Doc. 38). Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Harry F. Barnes, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

## 1. Background

Perry was booked into the Hempstead County Detention Facility (HCDF) on December 11, 2006, on theft of property, possession of instruments of crime, and criminal mischief charges. *Response* (Doc. 36)(hereinafter *Resp.*) at ¶ 1(A). He was held solely because of the pending criminal charges. In April of 2007, he was convicted. *Id.* at ¶ 1(B). He remained incarcerated at the HCDF until June 20, 2007, when he was transferred to the Arkansas Department of Correction (ADC).

According to Defendants, on December 29, 2006, Perry was covering the video camera in H pod with a blanket. *Defts' Ex.* F. Specifically, Lt. Mike Gray wrote the following report:

> At approximately 14:45 Officer Garland called me from control with a problem from Inmate Perry. Inmate Perry was covering the video camera with a blanket in H-pod. I spoke to Inmate Perry via the intercom in control. He was told several times to remove the blanket from the camera. He responded saying that it would be a human sacrafice if someone came to H-pod to remove the blanket. I then left control headed to H-pod. As I opened the door to H-pod Inmate Perry had wrapped his face with a towel. He made an aggressive move twords me and I pepper sprayed him. I then removed the blanket from the camera and went back to the book-in area. I reported my actions to Lt. Godbolt of the oncoming shift and Sgt. Ames. My shift ended at 1500 and I left for the day. I instructed Lt. Godbolt inmate Perry would need a shower and that he had been causing trouble throughout our shift.

*Defts. Ex.* F.

According to Perry, he had his sheets on the door drying out because they were wet. *Resp.* at ¶ 3. The way the cameras are made, Perry maintains you cannot hang a blanket on them. *Id.* Perry denies having made the comment about there being a human sacrifice or that Gray said anything to him over the intercom. *Resp.* at ¶ 5 & ¶ 6. Perry denies having a towel around his face. *Id.* at ¶ 7. In fact, he states when Gray came into H-pod he was sitting at the table writing a letter. *Id.* at ¶ 8. According to Perry, he made no aggressive move towards Gray and Gray sprayed him for no reason and then went back to the book-in area. *Id.* at ¶ 9 & ¶ 10. Furthermore, when Godbolt

came on duty Perry states he did not know Perry had been sprayed. *Resp.* at ¶ 11(B). Godbolt did open the cell door and shower door so Perry could shower. *Id.*

Sgt. Ames was not in H-pod when the incident between Perry and Gray occurred and was not personally involved in the incident. *Resp.* at ¶ 12(A). Lori Jones was not in H-pod when the incident occurred or personally involved in it, however, Perry contends she should be held liable because she is the nurse at the jail and she was told that his face and head was bleeding from the spray. *Id.* at ¶ 12(B). Perry maintains she said she didn't do eyes. *Id.* Shawn Garland was not in H-pod when the incident between Perry and Gray occurred and was not personally involved in the incident. *Id.* at ¶ 12(C).

When the shift changed, Perry was allowed to shower or clean off the pepper spray. *Resp.* at ¶ 13. As a result of the application of the spray, Perry maintains his head and face were bleeding and the vision in his right eye was and remains damaged. *Id.* at ¶ 14. Perry indicated he has seen his private doctor for his eyes and for the bleeding. *Id.* According to Perry, Jones would not provide treatment for his injuries. *Id.* Weeks later Perry states he was given eye drops for his eyes but he states he is still trying to recover from his eye injuries. *Id.*

On January 6, 2007, Perry was again involved in an altercation with jail staff that required the use of Oleoresin Capsicum (pepper) spray. *Resp.* at ¶ 15. At approximately 9:00 p.m., Garland, who was working the control room, advised Ames that Perry had covered the video camera in B pod. *Defts' Ex.* B at page 2. According to Garland, he asked Perry several times to uncover the camera and that Perry stated he would not remove the item and that someone had to be sacrificed. *Id.*

Garland contacted dispatch for extra officers who could assist with Perry. *Defts' Ex.* B at page 2; *Resp.* at ¶ 18. Lt. Dorman, Sgt. Johnson, Cpl. Weaver, and Ames went to B pod. *Defts' Ex.*

B at page 2; *Resp.* at ¶ 19. According to Ames, when the officers arrived at B pod, Perry was at the door in an offensive position. *Defts' Ex.* B at page 2. According to Perry, when the officers arrived he was at another inmate's door talking and when he saw what was going on he stood in front of the camera with his back to the wall. *Resp.* at ¶ 20.

Once the door to B pod was opened, Ames began spraying Perry with pepper spray. *Defts' Ex.* B at page 2; *Resp.* at ¶ 21. According to Ames, Perry tried to run into cell #2 where he was detained by the assisting officers. *Defts' Ex.* B at page 2. Perry, however, states the other officers never got involved. *Resp.* at ¶ 22. Ames then escorted Perry to the holding cell. *Resp.* at ¶ 23. Perry was given a towel to remove the pepper spray from his face. *Id.* at ¶ 24. Ames took Perry to the yard for fresh air. *Id.* at ¶ 25. Perry was then escorted back to his cell where he was able to take a shower. *Id.* at ¶ 26.

Neither Gray nor Garland were involved in the incident on January 6th or physically present when it occurred. *Resp.* at ¶ 27 & ¶ 29. Perry does not maintain Jones was physically present on January 6th or involved in the use of the pepper spray. *Id.* at ¶ 28. However, he maintains she was the nurse at the jail and that she again refused him any medical treatment. *Id.*

Jail Administrator Louise Phillips reviewed the reports on the January 6th incident. *Defts' Ex.* B and C. It is the policy of the HCDF that after pepper spray is used on an individual that the individual is immediately decontaminated. *Resp.* at ¶ 31. Perry's HCDF jail file contains no record of Perry requesting medical attention for pepper spray being used on him on December 29, 2006, or January 6, 2007. Perry maintains he did submit requests for medical treatment but does not have copies. *Resp.* at ¶ 32. He indicates you had to pay for copies and he did not have any money. *Id.*

All decisions about Perry's medical care and treatment while at the HCDF were made by medical personnel at the facility. *Resp.* at ¶ 33. Gray, Ames, and Garland played no role in determining what type of medical treatment Perry should receive. *Id.* at ¶ 34.

On January 7, 2007, Perry submitted a request to see an eye doctor. *Defts' Ex.* D; *Resp.* at ¶ 35. He said his right eye was blurry and he could not see out of it. *Id.* The request didn't mention pepper spray or the incident with Ames. *Defts' Ex.* D. Perry was seen on January 10th by a nurse practitioner and prescribed natural tears. *Defts' Ex.* 2 (attached to (Doc. 38)). He was seen again by the nurse practitioner on January 19th complaining of right eye discomfort and blurring. *Id.* A note was made that he had not had his contacts since his incarceration. *Id.* A note was also made that his family should bring his contacts to him and if that did not correct the problem an appointment would be scheduled for him to see an eye doctor. *Id.* He was seen again by the nurse practitioner on February 7th complaining of burning in his right eye. *Id.* An appointment was scheduled for Perry to him to see an eye doctor on February 14th. *Defts' Ex.* 3 (attached to (Doc. 38)).

On January 8th, Perry submitted a request saying he needed to see someone from mental health soon. *Resp.* at ¶ 37. He stated he did not believe he could take much more of this. *Id.* He said he was depressed. *Id.* Perry states he was depressed "from being attacked by Sgt. Ames and Lt. Gray and when I was attack by Sgt. Ames it was all I could take." *Id.* An appointment was scheduled the following day. *Defts' Ex.* E.

In the questionnaire propounded to assist Perry in responding to the Motion for Summary Judgment, Perry was asked how Jones exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 39. He responded that she refused to treat his eyes because of the pepper spray. *Id.*

However, it appears the two requests for medical care he submitted were responded to by the facility and doctor appointments scheduled for him. *Id.* at ¶ 40.

Perry was asked whether he contended Gray used excessive force against him. *Resp.* at ¶ 41. He responded yes. *Id.* He stated Gray pushed him up against the wall so he could not get away. *Id.* Perry states he was bleeding from Gray's use of force. *Id.* Perry states it is jail policy if an inmate breaks the rules they get a written disciplinary as a result of their actions. *Id.* Perry points out he did not receive a disciplinary for his actions that day. *Id.* If he did something wrong, he questions why he was not disciplined. *Id.* Perry also contends Ames used excessive force against him when he used pepper spray against him. *Resp.* at ¶ 42. Perry does not contend Garland used excessive force against him. *Id.* at ¶ 43.

## 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Arguments of the Parties

Defendants contend they are entitled to summary judgment on the excessive force claims. They maintain only the amount of force reasonably necessary to control Perry and to get him to comply with the officers' orders was used. As a matter of law, they maintain the use of force was reasonable under the circumstances.

With respect to the denial of medical care claim, they first point out that the only Defendant involved in the provision of medical care at the facility was Nurse Jones. Defendants point out that after each application of pepper spray Perry was offered an opportunity to decontaminate. Furthermore, they point out Perry only submitted two medical requests and both times they were promptly addressed and appointments with medical doctors were made for him. As such, they maintain there is no evidence of deliberate indifference to Perry's serious medical needs.

Perry maintains he was subjected to excessive force both times pepper spray was used against him. He argues the use of pepper spray was not justifiable and Gray and Ames had alternative means of discipline they could have used. Moreover, he points out neither officer charged him with a disciplinary violation. He asserts he is entitled to judgment in his favor because there was no legitimate penological objective to utilizing pepper spray against him as opposed to writing him a disciplinary.

With respect to his denial of medical care claim, Perry points out neither Gray or Ames ever said they took him for medical treatment following the application of the spray. He maintains the

Eighth Amendment establishes the government's obligation to provide medical care. He contends as a matter of law he is entitled to judgment in his favor as he was undisputedly not provided medical care after being sprayed.

## 4. Discussion

As noted above, Perry asserts both excessive force and denial of medical care claims. I will address these claims separately.

### *(A). Excessive Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Perry was a pretrial detainee when both alleged incidents of excessive force occurred. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

Courts, including the Eighth Circuit, have concluded that "a limited application of [non-lethal chemical agent] to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000)(discussing cases from a number of jurisdictions holding the use of chemical agents did not constitute cruel and unusual punishment if reasonably necessary to maintain security and order or subdue a recalcitrant prisoner). The Eighth Circuit also noted that when "[u]sed in such manner and purpose, its application should 'rarely be a proper basis for judicial oversight.'" *Jones*, 207 F.3d at 496.

In *Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006), the court considered factors including whether the actions of the officers were defensive in nature or motivated by anger; whether the actions were necessary to maintain order or were excessive reactions by frustrated officers; and whether the amount of force used was commensurate with the situation. *Id.* The court noted

additional material issues included whether or not the Plaintiff failed to comply with orders given by officers in the cell, whether the Plaintiff was actively resisting them, whether verbal orders or the application of less force would have been sufficient, whether or not a warning issued before the application of the pepper spray, and whether the Plaintiff suffered real injuries. *Id.*

Pepper spray (Oleoresin Capsicum(OC) spray) was used against Perry by Gray on December 29, 2006, and then again by Ames on January 6, 2007. *Defts' Ex.* F; *Defts' Ex.* B. With respect to the December 29th incident, Perry maintains he had not covered the camera in his cell, instead he states he was merely drying sheets on his cell door and did not have the camera covered. *Resp.* at ¶ 3. In fact, he maintains the cameras are made so you cannot hang anything on them. *Id.* Perry asserts he did not have a towel wrapped around his face, was not warned by Gray to remove the towel from the camera, never made the statement attributed to him by Gray, made no aggressive move towards Gray, and was merely sitting at the table writing when he was sprayed for no reason. *Resp.* at ¶¶ 4-10. Perry does agree that after shift change he was allowed by Godbolt to shower. *Id.* at ¶ 11(B). However, he states this was thirty or forty minutes after he had been sprayed. *Id.*

In this case, I conclude there are genuine issues of material fact as to whether the use of force by Gray on December 29th was reasonable under the circumstances. Gray's argument in support of summary judgment requires the Court to accept his version of the events over Plaintiff's version. Similarly, Plaintiff's argument in favor of summary judgment requires the Court to accept his version of the facts. The Court cannot do this at the summary judgment stage.

However, I do believe the remaining Defendants are entitled to summary judgment on the excessive force claim stemming from the December 29th incident. Neither Ames, Garland, or Jones

were involved in the application of spray. *Resp.* at ¶ 12(A)-¶ 12(C). Perry does not dispute this and therefore, there is no genuine issue of fact regarding this claim against these Defendants.

With respect to the January 6th incident, Perry indicates he is without knowledge to agree or disagree with the statement that Garland advised Ames that Perry had covered the camera in B pod. *Resp.* at ¶ 16. Perry denies he made a statement that someone had to be sacrificed but does not deny that he was asked several times to uncover the camera. *Id.* at ¶ 17. For purposes of the motion, it can therefore be assumed he refused to obey the orders of the officers. While Perry denies he was in an "offensive position," when the officers arrived in the pod, Perry states he merely stood in front of the camera with his back to the wall when the officers arrived at the pod. *Id.* at ¶ 20. Once the pod door was opened, Perry was sprayed with pepper spray. *Id.* at ¶ 21.

It is apparent that Perry refused to comply with the orders of the officers and took a stance that could reasonably be viewed as aggressive. Perry was allowed to decontaminate immediately after the use of the spray. Under these circumstances, a limited application of the pepper spray was a reasonable response. *Jones*, 207 F.3d at 496. I find no genuine issue of fact exists as to whether Ames used excessive force on January 6th. I therefore find Defendants entitled to summary judgment with respect to the January 6, 2007, application of pepper spray.

### (B). Denial of Adequate Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the

Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical

evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Perry contends he was denied medical care following application of the pepper spray on December 29th and January 6th. In connection with the alleged injuries to his face caused by the pepper spray, there is no indication in the summary judgment record that Perry submitted any requests for medical treatment that mention these injuries or the application of spray. The only two requests for medical treatment submitted by Perry were promptly addressed. *Defts' Ex.* D & *Defts' Ex.* E.

After spray was applied on both December 29th and January 6th, Perry was allowed to decontaminate. *Resp.* at ¶ 13 & ¶ 26. Perry maintains his right eye is still "messed up" because of the application of spray. *Id.* at ¶ 14. He maintains Jones refused to assist him because she did not

do "eyes." However, following his request on January 7th, Perry was seen the first time on January 10th by a nurse practitioner and then two more times by a nurse practitioner before he was sent to an eye doctor. Therefore at most, Perry alleges Jones delayed in sending him to a doctor for treatment for his eyes. Perry's written request for treatment for his right eye was submitted on January 7th. *Defts' Ex.* D. Perry indicated his eye was real blurry and he couldn't see. *Id.* Perry's appointment was scheduled with the eye doctor for February 14th. *Id.* The record contains no information on whether this was the first available appointment.

In this case, I believe there are no genuine issues of material fact as to whether Jones exhibited deliberate indifference to Perry's serious medical needs. First, with respect to the alleged injuries to Perry's head, face, and eyes on December 29th, *resp.* at ¶ 14, there is no indication he sought medical treatment for the alleged injuries or that Jones ignored an acute or escalating condition with respect to his health. *See e.g., Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001)("Like any other civil litigant [a pro se litigant is] required to respond to defendants' motion with specific factual support for his claims to avoid summary judgment"). There are no grievances, medical treatment requests, incident reports, or any other documents that mention any injury to Perry or any requests on his behalf for medical treatment until January 7th.

With respect to the alleged injury to his eyes from the application of pepper spray on December 29th and January 6th, the evidence in the record is that Perry sought treatment for his right eye on January 7th. An appointment was scheduled for him to see an eye doctor on February 14th. "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment. To establish this effect, the inmate must place verifying

medical evidence in the record to establish the detrimental effect of delay in medical treatment ..." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(internal quotation marks and citations omitted). Perry submitted no evidence suggesting any delay in his obtaining treatment for his eyes had a detrimental effect. He therefore failed to raise a genuine issue of fact with respect to this claim.

With respect to the Defendants other than Jones, there is no evidence they were personally involved in the provision of medical care or treatment. *Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). There is simply no basis on which Ames, Garland, or Gray can be held liable for actions taken by Jones. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535-36 (8th Cir. 1999).

### 5. Conclusion

For the reasons stated, I recommend that the Defendants' motion for summary judgment (Doc. 25) be granted in part and denied in part. Specifically, I recommend as follows: (1) with respect to the alleged use of excessive force on December 29, 2006, I recommend that all Defendants be granted summary judgment except for Lt. Mike Gray; (2) with respect to the alleged use of excessive force on January 6, 2007, I recommend that all Defendants be granted summary judgment; and (3) I recommend Defendants be granted summary judgment on the denial of medical care claims. This would dismiss all claims against Sgt. Simeon Ames, Shawn Garland, and Nurse Lori Jones. I further recommend that Plaintiff's motion for summary judgment (Doc. 37) be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **11th day of August 2008.**

                                        /s/ Barry A. Bryant
                                        HON. BARRY A. BRYANT
                                        UNITED STATES MAGISTRATE JUDGE